Good morning, Your Honor. May it please the Court. If I may apportion my time for my opening arguments, seven minutes and three minutes for Paul, I'll help you. Thank you, Your Honor. And I must say, Judge Olicon, it's been many years since we've seen each other. And it's good to see you again. The importance of unbiased evidence gathering in the pre-prosecution process. Could you introduce yourself for the record? Yes, Your Honor. My name is Eric Holder, Jr. I'm an attorney at the U.S. Supreme Court. And I'm here to talk about the case of Charles Carrion appearing for plaintiff appellant Gary Arter. Thank you. Thank you, Your Honor. As I was saying, the importance of unbiased evidence gathering is essential to the pre-prosecution process. The police officer is essentially what I would call a street magistrate who is doing the initial collection of evidence. And it's fundamentally unfair to the criminally accused for that street magistrate to fabricate evidence. And it is also damaging to the entire prosecutorial process for the police officer to withhold evidence in response to a timely request from the defense for what would be exculpatory material, in this case, San Francisco video tape. The evidence was something to do with the software that was needed in order to view the SFPD videos. Yes, Your Honor. And the detective testified that he didn't realize there was specialized software. So how can we conclude from that that it was Detective Castell who was dragging his feet on producing discovery? Oh, well, that is why I included the information, the case materials, the discovery material that I obtained from the San Mateo District Attorney's Office with respect to the Chome prosecution, which was a legitimate prosecution. Was that the case before involving the three employees? Exactly, Your Honor, who embezzled a great deal of money. And on that occasion, Detective Castell did a great investigation. The problem was that you weren't given the software. Is that it? Or they just didn't provide you with the disks at all? It was sort of a phased, continuing problem. I did receive a disk after, I believe, after I filed a motion. I received a disk. It did not have the Endura software. When Detective Castell sent the Chome discovery, he sent it along with his response to a discovery request very promptly, within two weeks, and it apparently included the Endura software because there was no further discussion with defense counsel attempting to get that. So I guess other than the bare fact of delay, now that we know that there is a computer issue attending it, what evidence did you offer to the district court to prove that that was done deliberately by Detective Castell? That the primary evidence was, first of all, that the Chome case establishes a baseline for his confidence. Second, the testimony of his buddy, the San Francisco police officer, who actually burns CDs for him. Well, it's their system, right? This is an unusual situation because the airport's in San Mateo County, and we've got both San Mateo County sheriffs, deputies, and San Francisco police officers providing security. Yes, Your Honor, they have one of those compacts. So they share all their evidence. Right. But the equipment actually belongs to San Francisco, not to San Mateo County. And the custodian, if you will, of the video equipment is a San Francisco police officer, not Detective Castell. Detective Castell has it on his computer, Your Honor. And he uses it to view videos any time he wants. I thought his testimony was that he routed that request to, I'll call him the evidence officer, who was the San Francisco police officer, in order to comply with your discovery request. He spoke with SFPD Hill, testified that Mr. Detective Castell had been using the EnduraPlayer software on his own computer since 2005. Yes, but that doesn't mean that you have it on your computer. Castell has it. He says he put it on Castell's computer. Maybe you and I are talking past one another. I thought you said you needed the software on your computer in your law office in order, when you first got the disc, because it wouldn't play. Yeah. Yes. Correct. Okay. So I'm still having a hard time understanding what the contested issue of material fact is from which we should conclude that there's a legitimate dispute over. I mean, is this the best argument? That's what I'm thinking. I mean, we're burning up a lot of your time on it. Could I? Exactly. If I could turn to another issue, and then I would like to talk about the dispute, the evidence of a falsified police report. But before I even ask you about that, I had a question. Even if there was a constitutional violation, so I'll call it a Castanich violation rather than a Devereux violation, because this seems very different from Devereux, there still has to be prejudice to the complaining party. And there was evidence in the record undisputed that Davis said, I've seen in this jar and pocket money. And there is evidence that the boss, the manager, reported that to the police. And then they viewed, whatever they viewed, they saw things. The video didn't disprove that he was pocketing money. So I guess the question was, was there – May I ask who saw the video? I'm sorry? Who saw the video? According – I saw the video. Okay. And the video doesn't – I don't think Sarduchenko or – The video doesn't disprove what the police reported. There's some discrepancy. In your view, it does not. It's ambiguous. Let's just say, for purposes of arguments, it's ambiguous or inconclusive. And so the question would be, was there sufficient evidence to prosecute Arden, Mr. Arden, regardless of what discrepancies were in the police report so that there wasn't any prejudice? So that was one question that came to mind when I read the various claims.  Oh, yes, Your Honor. I personally feel that the imputation of entirely false statements to Mr. Romeo Fernando, the skycap, is the most egregious, having seen a prosecutor and a defense lawyer. But even putting that out – so what I was asking was, we have the testimony from Davis, and he never backed up on that. You know, Mr. Fernando said, no, I'm scared, I'll take this back, I'll recant. But Davis never recanted. And so with that, plus the observations of the police officers, would that have been enough to prosecute regardless? I do not believe that this Court, nor the Court below, could properly determine that on summary judgment. I do believe that is an issue of trial for fact. And Your Honor, just really put your finger on it. You wanted to say three minutes, and you've got two and a half left. I've got two and a half. I'll resume, Your Honor. All right. So we just talked about Mr. Fernando. And on de novo review, this Court views the issue from its own perspective, and I do believe that the light from the video that sheds upon it – I take it that my perception, the plaintiff's counsel in this case, is that that video is more exculpatory and less ambiguous. But I find Detective Castell's attempt to conform his declaration to the video, once he has seen it, to be quite illuminating. Because while he testified at the October 16th suppression hearing that he saw Mr. Arden pocket money six times, and he recorded on page four of Castell's report that he saw it happen four times, and at the suppression hearing and in the report, he stated that he saw Mr. Arden use a round key, which, interestingly enough, was not among the items that were seized into evidence. I mean, maybe this does give force to your argument that a jury is going to have to sort all this out. I mean, that's all good impeachment material, but you're overlooking facts like the $109 in small bills in his pocket when the officers interview him right after they observe him doing whatever he was doing at the smart cart machine. And his explanation is, I stopped at a cash machine on the way to the airport and I didn't buy anything. But he doesn't have any $20 bills in his pocket. What have we got here, Your Honor? We have got strong, corroborating evidence that he's taken money from people buying smart carts and sticking it in his left front pocket like the witnesses told him, told Mrs. Syriachenko before she called Detective Castell. Well, Your Honor, I don't think that any negative implication in the absence of somebody having some dope along with them that the money is, in fact, the proceeds of crime is warranted. Well, but the carts are sold for $4 apiece and he had $14, $1 bills and a bunch of $5 bills, but no $20 bills, Ms. Karan. Your Honor, that's a huge issue. I mean, that's a conflict here. That is a very inconvenient fact for Ms. Syriachenko. Absolutely, and one that the jury will undoubtedly prefer in their minds. But do we have a defense? Excuse me, Your Honor. Probable cause. Whether there's a genuine issue as to probable cause, I think, is a thing. Well, I think the issue here is whether Detective Castell's assertion about what Mr. Arden said, which Mr. Arden has denied saying or making any statements whatsoever about the ATM money. Well, I assume that Detective Corkery's partner is going to be available to testify that that's what he said. There you go. Well, Corkery is supposedly the guy who interviewed the four witnesses, except that Castell testified on October 16th under oath in open court that he interviewed the disappearing witnesses. So how's Corkery being held? All right. I think we understand your position. You've used up all your time. Let's hear from Mr. Lee. Thank you. All right. Thank you, Mr. Lee. May it please the court, David Levy appearing on behalf of the respondent. I think by the tenor of some of the court's questions that you do correctly evaluate the significance of the video and how it corroborates not only the police report and the testimony of Detective Castell, but frankly, Romeo Serdiochenko, Davis, and everyone else. I'm sorry. Go ahead. You've got some big problems in this case, though, Mr. Levy. You've got witnesses who, if we credit what Detective Castell said in his report, basically went sideways on him and in their deposition. Apparently the magistrate judge thought it was because Mr. Fernandez was scared and he'd been named as a defendant in the lawsuit, but he certainly does appear to retract statements that he made to the detective that are pretty important to the issues here. I agree with you that it is not helpful.  Because Fernandez only reported what he saw on February 2nd. He reported that to Davis, who in turn reported it to Serdiochenko, who then the following morning on the 3rd reported it to Detective Castell. Didn't the detective briefly speak with Fernandez during the surveillance because he saw him there? He did. And he retracted that statement, too. He retracted that. Fernandez retracted that statement, although, as the district court correctly observed, as did all of us who attended the deposition, he would say, no, I didn't say that, but, you know, I really don't want to get involved. And, you know, I really don't want to have anything to do with this. We've seen this is not the first time at the rodeo for witnesses who have retracted their statements, but the question is could, in the face of that fact, the retraction from a key non-police witness on whom the officer was relying in part for probable cause, could the magistrate properly grant summary judgment or are we going to just have to let a jury decide whether or not Mr. Fernandez changed his story because he was scared? It was correct for the magistrate judge because it was simply a statement made by Fernandez to Davis. Again, I agree that Fernandez denies having said any of that and denies saying that to Detective Castell. However, it started the process of motion for Davis to then speak to Sergio Chenko, and when she spoke to Castell, he started his investigation. He did not base his investigation on what Fernandez had said. So opposing counsel says there is not enough evidence. So my question was even if there was a constitutional violation of Mr. Arden's rights, is there enough, was there prejudice, which would be is there a genuine issue of material fact that there was probable cause to prosecute taking out the disputed statements? And so what we're left with, I think, is Davis' statement, and I can't say her name, the manager's statement, and the ambiguous video, and I guess the $109 that was found in the pocket. Is there enough that you would say that there is not a genuine issue of material fact that there was probable cause to prosecute him? Yes. The mere fact that the defendant denies having stolen the money doesn't necessarily mean there is inadequate probable cause. If you take all the facts together, not only the video, which I actually think it is unambiguous in the sense that when you take into account the declaration of Needham, who was the district manager, and the statements of Serdyukchenko, it was clear that Mr. Arden wasn't supposed to be hanging around this one unit. His responsibility was to be throughout the entire airport. And so over a two-hour period, he should have been there a minute or so. Instead, he is there two hours. He is likely aware of the camera behind him. That's speculative. I admit that. Which would explain why he hung his jacket over the back of the machine covering the key. Exactly. And why the camera shows him from the back, and so you can't exactly see what he is doing with his hands in front. But you can definitely see that he is there for two hours. He is taking money from customers or potential customers, putting it in his pocket. Sometimes you can't see George Washington's face on the bills, but you can see him getting something from the folks, putting it in his left pants pocket, and then remembering also that Detective Castell and Corkery are watching this from a perpendicular angle behind what I'll call smoked glass. So Arden doesn't realize he's being observed, but the two detectives can see very clearly what is going on, even if the camera can't catch it. But they could clearly be impeached. I mean, the police report suggests, in comparison to other evidence, suggests an exaggeration. So Ava says, I told him one time, and Castell says four or five times that he was stealing. And then the who interviewed the witnesses. I mean, there's lots of discrepancies between the police report. I mean, they're not necessarily material discrepancies, but there's definitely discrepancies, right? Do you disagree with that? I don't disagree that there's some minor discrepancies. I think Corkery and Castell may well have spoken to witnesses, but because Corkery did not do a separate report, we only have his declaration. But I agree that there are some discrepancies. At one point, in fact, in the report, the detective misstates the amount of money he had. He added up the bills wrong. But then later, the evidence log shows that it adds up to 109. So there are minor discrepancies, but the overwhelming evidence is that there was probable cause to arrest. He actually was not arrested, but the district court did find, for our purposes, that all attendance in favor of the plaintiff appellant, that there was an arrest. Can you tick off for us, without regard to disputes between the witnesses' testimony, what material facts are not in genuine dispute that would still establish probable cause and would not require a jury determination as to who's telling the truth? Fair enough. It was not proper for Mr. Arden to be taking money from customers. He did, and he put it in his pocket. It was not proper for him to be at that location for two hours. I appreciate that's not a crime, but it's strongly corroborative. He had $109 in small, crumpled-up bills stuffed in his pocket. When he is asked about the money, at one point he said, no, I didn't take any. And then he said, well, I took some at one point, but I went to the ATM and got cash. Well, as the court pointed out, that doesn't make any sense. It is damning. All of that, some of the actions that are described in the video, I refer to Needham Declaration where he does describe it as being, you know, while you and I may just be walking by and not think anything of it, someone in the business knows exactly what's going on. All of that, in combination, shows that this fellow was getting cash from this employer, embezzling. And I guess you could also add the initial call from the reporting person who reported what Mr. Davis had told her that he had observed. Exactly, but I think it's important that Detective Castell didn't take that information, and walk down to the sidewalk. No, it's like a tip from an untested informant. But then he goes to the scene, he does the stakeout, and he corroborates information. I mean, it's the left pocket that Mr. Arden is putting his money into, which is what all the witnesses said, assuming that that's what they said. All right, anything else? And then how about the testimony from Davis? Was that disputed? I thought that his statement that he saw Arden sell a cart in pocket money was undisputed, that he made that testimony. Was there a question about that as well? I think he was asked at one point how many people he saw. Now we're kind of testing my recollection on that, and I apologize. He was asked how many people, and I think he said a couple, or he said a lady in a pink dress or a red dress, and then shown the video from February 2nd, and he couldn't spot that. But he very clearly did testify that. Now I'm giving my deposition two years or so after the fact, but I can tell you that when I spoke to Detective Kistel in February of 2011, I told him what I had observed. I told him the truth. Okay. I think that's all we have. Thank you. Thank you. The case just argued is submitted. We will now hear argument in the case of Emilio Abraham Barahona Soriano versus Eric Holder, number 12-71692. Mr. Guzman. Thank you, Your Honors. May it please the Court. Eric Guzman with John Woo on behalf of Mr. Barahona Soriano. Mr. Soriano should not be removed to El Salvador. The immigration judge should have granted withholding of removal. Should have granted a claim of cavity. I'd like to take that issue first. This Court reviews the BIA's decision regarding cavity for substantial evidence, and the standard as articulated in Zane versus Gonzales is that if the record compels a contrary result, then this Court should reverse on that issue. The record establishes clearly and compels a contrary result, that Mr. Soriano, homosexual, HIV-positive male, will suffer torture, as torture is defined by the circuit's precedent. The declaration supplied by Mr. Hernandez, I see Mr. Hernandez is a gentleman, William Hernandez, who's a, I guess you'd call him an expert on the field. This is the 46-page declaration that we have in the record? Yes, Your Honors, from pages 180 to, 180 to approximately 223 of the administrative record. I have a couple of questions about the report. The two, one is, and perhaps you could address them both in turn. One was whether there was sufficient evidence, and this is what the BIA found, to show that Mr. Barahona individually himself would be targeted when he, if he went back to the country. So the BIA was, it's 49 incidents in 11 years, and so there's nothing that it would establish that he would be likely subject to torture upon his return. The second question I have is about whether that report showed the necessary willful blindness, because I only saw a couple of incidents where it stated that the crimes were reported to the police, and the police failed to investigate. So maybe you could address those two issues for me. Your Honor, the first issue, does he face an individual danger? He does. Now, there are a couple of facts that support that. First of all, Mr. Barahona testified at the mayor's hearing that if he ceases taking his antiviral medication, that blemishes start to appear on his skin and they become visible. There's also evidence both at the hearing and in the record that that antiviral medication, that is often subsidized in America and it is in San Francisco, is very hard and scant to find in El Salvador. And there was a declaration from a doctor who was treating Mr. Barahona in San Quentin that it's really difficult to find that drug in El Salvador. So one, he will likely go some time, not a long time, without the medication. And if the blemishes appear, then it will become more obvious. Secondly, he will have to search. I'm sorry. So make the link with the evidence in the record between that he has a disease that will become more evident and that he will be subject to a violent attack. I mean, that's the key for you, I think. Well, the point I was attempting to make, Your Honor, is that it will be physically apparent to people that he sees. And due to the paucity of that medication, he will have to search out vigorously trying to find that type of medication, find a place that would treat HIV-positive individuals. And by doing that, he will expose himself as someone who has that disease. Moreover, it is commonly perceived in that country that there's a link between HIV and homosexuality. So his identification as someone with that disease, at least in the mind, according to the record of many people in El Salvador, will equate that to his identity as a homosexual. And therein lies the individual danger. Well, so if there was evidence that every homosexual person in El Salvador is subject to torture, then you would have made the link. But the BIA did not think that was the case and relied on the country report showing government, showing discrimination, but not torture and governmental ameliorative measures and entre amigos and the like. Thank you, Your Honor. I would respond as follows. First of all, at page 180 of the administrative record, Mr. Hernandez explicitly says this is an incomplete list of some of the incidents, some of the highlights, but this is far from exhaustive. Second, at page 183, he points out that in 2006, his organization received massive funding cuts, which made it more difficult for him to compile these incidents. Third, it is much more than discrimination. It is violent and horrific abuse and often murder, inflicted on the people of this community. He lists examples of individuals who were shot and ran over by a car repeatedly and left in the street, and that case was never investigated. A U.S. citizen, 75-year-old man, was murdered, and no investigation, no one was brought to justice for it. Another physician of El Salvador, this is a 183 missing record, was murdered with no investigation. Latest, 2008, a nurse was, a homosexual nurse was attacked and mocked in some part of the hospital in front of not only other hospital staff, but patients, and nothing happened, and there was no investigation, no administrative discipline. So the point is, these people are often attacked, killed, with impunity, and under, I'm sorry, I'm slipping on the case here, but the test is not government acquiescence or condoning, it's often inaction. If these attacks can be carried out with impunity, the people are not investigated and searched out. So that gets to my second question, actually, which was that the report only identified a couple of cases where the incidents were reported to the police, and so there wasn't, the report itself didn't document that the police, if a report was made to them, and they were able to identify the suspects, refused to follow up, and that's usually what we look at for willful blindness. Was there other evidence that supported willful blindness, or what's your argument on that? Well, I guess it would be two parts. One, that there were several incidents where, at least two incidents where the violence was committed by actual police officers, but the second is that there are no arrests or serious investigation brought forth to try to determine who carried out these attacks. That would be the two main bases you're on. And the supplemental point is, and it's an awkward argument, is that the police are not responsible for the attacks. That trial counsel attempted to supplement this issue with the testimony of Mr. Hernandez and was unable to do so. I mean, it's a very detailed, single-spaced, 46-page declaration. What additional evidence would Mr. Hernandez have offered that was not included in his declaration that was made an exhibit at the immigration hearing? Well, I'm speculating here, but perhaps... I don't want speculation. You can make a proffer, if you have a good faith basis, to articulate what additional evidence would have been added, but I want to know what you had that the I.J. never heard that Mr. Hernandez would have testified to that's not otherwise laid out in great detail in the declaration. I have a good faith basis that Judge Murray would have asked questions, very pointed questions, and maybe some of the questions that Your Honor is asking today, and I believe Mr. Hernandez would have attempted to respond to those questions. Now, what those answers would have been, I cannot say. Well, counsel, the problem that you have is a problem that every trial lawyer has when a judge won't allow the lawyer to put on a witness or some evidence, and that is there is no proffer that is part of the record as to what this witness would have said. What we have from Mr. Hernandez is a lot, but the question is what more would the immigration judge have heard in addition to what's in the declaration that would have made a difference in the outcome of the proceeding, or that might have convinced the judge to rule differently? It would be more current, as that the hearing would have occurred after he completed that declaration. Well, that's true of every trial that takes place after the declaration is prepared, but I'm hearing no specific answer to the question in terms of a proffer. I apologize, Your Honor, but I can't answer this. Well, you've answered the question, I guess. Thank you. If I could move on to the next point, Your Honor, it's regarding potentially particularly serious crime. In 2011, Delgado v. Holder, this Court held that that is a question of law that is reviewed by this Court for evasive discretion. At the outset, I'd like to point out that the BIA order, the BIA memorandum does not specify which conviction the BIA was determined to be a particularly serious crime, and that's important. It makes it very difficult for this Court to review. So I think at a minimum there should be a remand to the BIA as to which conviction they were finding to be the particularly serious crime. We're talking domestic violence, 273D, and the criminal threat. The 265.5 and the criminal threat conviction are 422. I thought they were both for the same incident. Is that incorrect? It was the same set of facts, the same overall event. Okay. Were they covered in all of the reports and the sentencing court's colloquy as to why he imposed a prison sentence based on your client's behavior that night? I mean, the sentencing judge definitely does discuss it, but I would like to, if I could, before I move past, make one quick point about why a remand I think is necessary. I guess the question that we're wrestling, well, maybe I should let you finish your statement. Go ahead. In the matter of NAM, the BIA said you have to look at the elements of the offense to see if it brings it within the ambit of a particularly serious crime. This is somewhat of a preliminary inquiry where you look at the elements of the offense. And from there, you go to see if the other Francisco factors warrant that determination as the particularly serious crime. Because we don't know which crime the BIA was considering to be particularly serious, it's impossible to do an element-by-element, or the element-by-element analysis. Second, the factual determinations made by the BIA are without any support in the record. And the evidence in the record is so strong against the conclusion reached by both the IJ, the criminal sentencing judge, and the BIA that a reversal is mandated. The BIA was quoting the sentencing transcript in saying it was a vicious assault and that she jumped out of the window and broke her foot. So I don't think you could say that the BIA's determination wasn't supported. It stated that it reviewed all of the various conviction records and actually quotes from the sentencing transcript. The sentencing judge was completely incorrect. The reliable evidence, the court is supposed to review all reliable evidence to determine whether or not the crime is particularly serious. And the reliable evidence establishes it was not and completely contradicts what the sentencing judge said. But we've got the witness statements that do that, do they not? I mean, we've got the testimony of the victim who survived this brutal attack, and we have the testimony of the young son who was an eyewitness to it, who corroborates what the father did to the mother. I don't understand your argument, if it's the sufficiency of the evidence argument. Your Honor, if I could just come to the summons, Your Honor. At case 153, when the son was first interviewed, on the date of the arrest, he told the officer that he was asleep and did not witness any of the events. And didn't even slip through. Two days later, after the second officer comes, then he has this vivid detail where he can quote verbatim these terrible threats. But on the day he was first arrested, on the day of the arrest, the son first said, I've slept unseen. Well, the problem with your argument, if this were a criminal appeal and we were listening to you challenge the sufficiency of the evidence, the answer in law is that if a finding of guilty was rendered by the finder of fact, we have to interpret those findings. We have to interpret those facts in the light most favorable to uphold the conviction. So it would essentially be that the jury wasn't dissuaded in finding the young boy incredible by virtue of that inconsistency. Instead, they believe that he heard his father say, I'm going to kill his mother. Well, I looked at the transcripts, Your Honor, and no one has brought these points up, so there's just a few more if I could make them. It's in the record. Well, I guess I'm wondering whether we should be considering this anyway, because we said in Penchikoff that we can't reassess the facts, but that's solely for the agency. We have to look only at a legal issue, so I don't think we can even look at these. What would be the basis for looking behind the legal determinations that were made by the BIA and IJ? That it was an impartial review of the record to the point where it constitutes an abuse of discretion. The following points, Your Honor. On the first day of the arrest when the ex-wife was first interviewed, the arresting officer described the injuries as non-serious. I think you're missing the point of Judge Akuta's question. This argument isn't helping the panel because our case law says we can't do what you're asking us to do. All we can do is ask whether the agency applied the law correctly, and then the agency makes the determination on the factual record as the law is applied. We don't revisit that factual determination. We don't have that power. I say it's our position that if the factual record is so contrary to the BIA's decision, that that in itself could constitute an abuse of discretion. Okay. I understand your argument. Let's hear from Mr. Molina. May it please the Court. My name is Ernesto Molina, Assistant Director with the U.S. Department of Justice's Office of Immigration Litigation, and I represent the Respondent's Attorney General in this case. Did you get promoted since the last time we saw you? Actually, yes, sir. Oh, congratulations. I didn't remember the title from your last appearance. Okay. Thank you much. In this case, the Court confronts a native and citizen of El Salvador who was convicted of willful and infliction of corporal injury on a spouse and criminal threats. The Board of Immigration Appeals acted within its discretion and correctly applied the law under a matter of Francesco and its factors in determining that those crimes constituted particularly serious crimes, barring Mr. Barahona from withholding a removal. Moreover, substantial evidence supports the Board's determination that Mr. Barahona failed to demonstrate that he would face torture at the hands of his wife, at the hands of the Salvadoran government, or with its acquiescence or willful blindness. I think we can start, I think what I'll do is start, or essentially go in the order that we've already, that was brought up by counsel, and look at the question of cat deferral first. The record in this case clearly supports the Board of Immigration Appeals decision, and it certainly does not compel a contrary conclusion. In looking at things like the State Department report, the State Department report looking at how homosexuals are treated, how people with HIV are treated, generally reported that while there is widespread discrimination for both groups, and there is some violence that is suffered by members of the lesbian, gay, bisexual, and transgender groups, the LGBT groups, I'll call them, those are not at the hands or with the acquiescence or willful blindness of the Salvadoran government. In fact, as the State Department report of 507 demonstrates, the Salvadoran government has in recent years been taking steps to help stem discrimination and violence against members of the LGBT group, and to help educate the population with regard to those who suffer from HIV and AIDS, and get rid of some associations or false associations made there. Now, looking at the evidence that was provided by the petitioner, there was a very thorough declaration provided by Mr. Hernandez, a member of the Among Friends group in El Salvador, which is, in fact, cited by the State Department report. And, in fact, the State Department report notes that that is part of the different trend that is seen in the Salvadoran government, is begun to change the way Salvadorans view the gay and lesbian communities. Now, Mr. Hernandez's testimony or statement is very detailed and covers 49 incidents, and possibly a large amount, but what the immigration judge and the board did was carefully look at that, and examine that in that group there were only two incidents that involved the police, and those did not arise to torture. Once you go through the remainder, there are many incidents where once a person was found injured or killed, the Salvadoran government did take steps. The police did investigate several. In fact, Mr. Hernandez's own statement indicates that there were some trials on people who were arrested in cases. So what we, moreover, when no action was taken, according to Mr. Hernandez, frequently it's because bodies were moved to the grave. And as I said, there were instances, much later, in states of decay, where there was no idea who the perpetrators were, where there was essentially not much for the Salvadoran government to do. And there were, yes, there were occasional instances where, in the words of Mr. Hernandez, no investigation followed up. But what that presents is at best a mixed bag of treatment of the gay and lesbian community by the Salvadoran government. And, in fact, that does not arise. Now, I think that I have covered much of the actual evidence regarding cat referral. And looking at that, I guess we can, I should take time to address a couple of questions that Judge Ikuda had, questions like, you know, how is it that Mr. Barrono may be discovered or may be targeted when he's in El Salvador. My colleague suggested that once he no longer has the medication because it's hard to get, he begins to develop physical symptoms that will make it easier to identify him. Well, that does demonstrate that people may begin to, some people may begin to understand that he's a victim, but it doesn't demonstrate that he's necessarily going to be targeted on that account. And, in fact, as the State Department report indicates, people with HIV and AIDS are not subject to widespread torture either by the Salvadoran government or with its acquiescence. And that's evidence that the Board is entitled to rely on in reaching its conclusion. From there, I just want to make sure, I think that was one of the important points that Your Honor brought up. So I want to make sure that was, let's see, to the record. So I think that answers part of the question. I have a question about the withholding claim and that analysis. And that has to do with our jurisdiction over the various issues that were raised. We said in Pijekoff that we don't have jurisdiction to consider re-assessing facts or weighing the Frantescu factors. But we said in Ramadan that we do have jurisdiction over mixed questions of law and fact. So of the claims that are raised, over which claims do we have jurisdiction and which don't? In your view. Okay. I should offer one, I think it's one clarification, Ramadan, which is it's the application of law to undisputed fact was what Ramadan was talking about. And that's the mixed question of law that the Court does have. And certainly under the particularly serious crime standard, this Court has generally already said it can look to whether or not the Board applied the incorrect standard. You know, or didn't seem to apply the standard at all. Or, as one case of the Court indicated, provide a decision where the Court couldn't understand what decision had been made or the basis for the decision. And that was a decision where the Board had said, well, the case, if the Court gives me a moment I can pull it up, but I'll give the Court the facts first. It was a case involving resisting arrest. And the Board had said, well, that's resisting, that's interfering with justice, and that makes it particularly serious. And this Court said, well, under Board case law, the Board has said that crimes against people can be, or can generally be leaned towards being particularly serious crimes. And the Court also noted that under Board case law, crimes against property can also be particularly serious crimes. But the Court noted the Board had never established whether or not, you know, interfering with justice was enough. And the Court wasn't prohibiting the decision. It simply sent it back for clarification for why this resisting to justice created the sense of a particularly serious crime. And there what we get is the Court seeking sort of clarification of the actual legal standard being applied. That's the type of decision that can be applied. Now, looking at the Francescu factors, you know, when, you know, if the agency gets the actual statute wrong, I'm sure the Court would point that out. You know, looking at the State law, if they misunderstand the State law, I don't have any doubt the Court would probably seek to clarify that. I also have no question, but when it comes to the facts underlying the conviction, that's where things begin to go wrong. And I should say generally. Perhaps there will be something that gets way too far afield that perhaps shouldn't be considered. So opposing counsel says, look, if the factual record is so completely different from the BIA's findings, so that there's really no, say, in an extreme case, the BIA makes some findings, there's nothing in the record supporting the BIA's findings, that that we could review as a case. But if the BIA is so incorrect in its decision that it was getting the facts completely wrong, you know, it might have to go back for clarification in terms of was the Board looking at the right record or something to that effect, and that would be something to be fixed. But that's not the case here. I mean, the fact that the trial transcript was part of the basis that was used in the comments of the prosecutor and the judge began to form the basis of what the immigration judge and the Board found in this case. And there's no suggestion that that was incorrect. Moreover, in looking at the police reports after interviews with the victim and the petitioner's son in this case, there's no suggestion that the Board misread those cases. I mean, it's clear that the petitioner's wife related the several threats he made against her life. And the record is very clear that the immigration judge and the Board correctly noted that even the son heard the threats against his mother's life. And albeit didn't, wasn't an eyewitness to it, he was a recipient witness to it, and that's enough for the immigration judge and the Board to determine that those reports, and we understand that in this case, they generally got those correct. And it is for the Board to determine that when somebody punches their spouse repeatedly, straddles them, tends to choke them out, threatens their life and essentially drives them to jump or fall or drop out of a second-story window, that's particularly serious. And as the Board and the immigration judge both said, it's these familial relationships that require, that are particularly egregious because of the extreme trust that's involved in the situations. And for that reason, we have the case where that part of the Board's decision is beyond the Court's jurisdiction as cited by Pachinko. I think the Court just allowed me to answer most of its other questions in that long-winded answer. Do we have any other questions for Mr. Molina? No. May I sum up? You may. Thank you. In this case, the Board correctly applied the Francescu factors in this case in considering the underlying circumstances of the petitioner's crimes against his wife. Moreover, the record provides substantial evidence for the Board's determination that Mr. Barona does not face a criminal charge, and therefore, the Board does not compel a contrary conclusion. Therefore, the government urges that the Court deny the petition for review. Thank you very much. Thank you very much. The case just argued is submitted for decision, and we will take a ten-minute recess before hearing argument in the last two minutes.
judges: Alarcon, Tallman, Ikuta